# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, for the use of FAIRWAY, INC., <br><br> Plaintiff, <br><br> v. <br><br> MOUNTAIN DOOR & HARDWARE, INC.; CHARLES N. WHITE CONSTRUCTION CO.; ARCH INSURANCE CO., <br><br> Defendants. | No. 10-CV-675-BRB/KBM |

# ORDER DENYING PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

**BALDOCK**, Circuit Judge.[*]

Plaintiff Fairway Inc. (Fairway) and Defendants Charles N. White Construction Co. (White) and Arch Insurance Co. (Arch) have filed cross-motions for summary judgment pursuant to Fed. R. Civ. P. 56 (docs. 32 & 34). Those motions, which in their detail address only Fairway's Miller Act claim, or Count V (erroneously labeled Count VI) of the amended complaint, are denied. Because the parties are familiar with the nature of Fairway's allegations relating to the procurement and installation of doors at the new federal courthouse

---

[*]Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit Court of Appeals, sitting by designation pursuant to 28 U.S.C. § 291(b).

in Las Cruces, New Mexico, the Court need not provide a factual background. The Court will discuss the facts only as relevant to its analysis. Rather, the Court commences with a statement of the law applicable to this action. This statement is for the parties' benefit and, for reasons to become apparent, *the parties best pay careful attention*.

I.

Generally, the Miller Act, 40 U.S.C. § 3133, provides for the "[r]ights of persons furnishing labor or material" to a government project. To recover on a payment bond under § 3133, a claimant must prove by a preponderance of the evidence that it had a "contractual agreement with the prime contractor *or* with a 'subcontractor.'" F.D. Rich Co. v. United States ex rel. Indus. Lumber Co., 417 U.S. 116, 122 (1974) (emphasis added). So long as the requisite "contractual agreement" is present, the Miller Act is indifferent as to whether the claimant is a subcontractor, materialman, or laborer. Subsection (b) reads in relevant part:

> **(b) Right to bring a civil action.** –
> **(1) In General.** – Every person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131 of this title and that has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material for which the claim is made may bring a civil action on the payment bond for the amount unpaid at the time the civil action is brought . . . .
> **(2) Person having direct contractual relationship with a subcontractor.** – A person having a direct contractual relationship with a subcontractor but no contractual relationship, express or implied, with the contractor furnishing the payment bond may bring a civil action on the payment bond on giving written notice to the contractor within 90 days from the date on which the person did or performed the last of the labor or furnished or supplied the last of the material for which the claim is made. . . . .

40 U.S.C. § 3133(b)(1) & (b)(2).

2

Specifically, under the terms of subsection (b)(1) and (b)(2) read in tandem, subsection (b)(1) provides Fairway a cause of action on the payment bond, regardless of its status as a subcontractor, materialman, or laborer, if Fairway had a contractual relationship, express or implied, with White.  Subsection (b)(2) meanwhile provides Fairway a cause of action on the payment bond, again regardless of its status, if Fairway had a direct contractual relationship with Mountain Door, *provided that* Mountain Door was a "subcontractor" of White.  See Clifford F. MacEvoy Co. v. Tomkins, 322 U.S. 102, 107–08 (1944).  Either way, the question is one of federal law:  "The Miller Act provides a federal cause of action, and the scope of the remedy as well as the substance of the rights created thereby is a matter of federal, not state law."  F.D. Rich Co., 417 U.S. at 127.

A.

To reiterate, Fairway may recover under § 3133(b)(1) if Fairway, regardless of its status as a subcontractor or otherwise, proves it had a contractual relationship, express or implied, with White, the prime contractor.  The *sine qua non* of a contract is the exchange of promises.  The Tenth Circuit, in the context of a Tucker Act claim, 28 U.S.C. § 1491, explained that the difference between an express and implied contract is "one of proof.  The express contract is proven by testimony showing the promise and acceptance, whereas the implied contract is inferred from the acts of the parties and other circumstances showing an intent to contract."[1]  Kirk v. United States, 451 F.2d 690, 695 (10th Cir. 1971).  That a

---

[1] Among other things, the Tucker Act provides the Court of Federal Claims with jurisdiction over claims against the United States founded "upon any express or implied contract."  28 U.S.C. § 1491(a)(1).

promise "may be inferred wholly or partly from conduct" bears repeating. Restatement (Second) of Contracts § 4 (1981). "[T]here is no distinction in the effect of a promise whether it is expressed in writing, or orally, or in acts, or partly in one of these ways and partly in others." Id. § 19, cmt. a.

Notably, subsection (b)(1)'s protections extend only to express contracts and contracts implied-in-fact. See Fidelity and Deposit Co. v. Harris, 360 F.2d 402, 409–10 (9th Cir. 1966). The Miller Act does not encompass quasi-contractual obligations arising under theories such as unjust enrichment and quantum meruit. See Hydro Conduit Corp. v. Kemble, 793 P.2d 855, 861 (N.M. 1990) (noting that the theories of contract implied-in-law, unjust enrichment, and quantum meruit are "essentially the same."). Quasi-contractual obligations are equitable in nature, arise under state common law, and "'are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises. They are obligations created by law for reasons of justice.'" Id. (quoting Restatement of Contracts § 5, cmt. (a) (1932)). Of course, such theories of recovery may be pled as alternatives to a Miller Act claim. See United States ex rel. Sunworks Div. v. Ins. Co., 695 F.2d 455, 458 (10th Cir. 1982) (holding the Miller Act is not an exclusive remedy; therefore quantum meruit was properly pled in the alternative). In fact, Fairway's amended complaint contains pendent state law claims against White and Arch for unjust enrichment (Count III) and quantum meruit (Count IV). In their respective motions for summary judgment, however, neither side has presented any argument related to those claims.

B.

As an alternative to recovery under subsection (b)(1), Fairway may recover under § 3133(b)(2) if Fairway proves it had a direct contractual relationship with a "subcontractor" of White, allegedly Mountain Door in this case. The Miller Act does not define the term "subcontractor," and how the contracting parties define their relationship in a writing or otherwise is of minimal import. The Tenth Circuit has written in the context of a Miller Act claim that "'subcontractor' must be given a judicial interpretation and . . . its meaning is not dependent upon how the parties designate themselves." United States ex rel. Bryant v. Lembke Constr. Co., 370 F.2d 293, 296 (10th Cir. 1966). In MacEvoy, the Supreme Court defined a subcontractor as "one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, thus excluding ordinary laborers and materialmen." MacEvoy, 322 U.S. at 109. In F.D. Rich, the Supreme Court explained that whether a party may be designated a subcontractor as a matter of *fact* turns on the "total relationship" between the prime contractor and the alleged subcontractor. The "substantiality and importance" of the relationship between the two is the inquiry's principal focus. F.D. Rich, 417 U.S. at 1233–24.

In United States ex rel. E & H Steel Corp. v. C. Pyramid Enter., Inc., 509 F.3d 184 (3d Cir. 2007), the Third Circuit ably restated the law applicable to a subsection (b)(2) claim consistent with the Supreme Court's governing precedents. Rather than focusing, as courts often have, on "laundry lists of factors" to determine whether a party is a "subcontractor" within the meaning of the Miller Act, see, e.g., United States ex rel. Conveyor Rental & Sales

5

Co., v. Aetna Cas. & Sur. Co., 981 F.2d 448, 451–52 (9th Cir. 1992), the Third Circuit focused its analysis "on the formulas provided by the Supreme Court, vague as they are:"

> We begin with the premise that the Miller Act is to be interpreted liberally to protect persons who supply labor or materials for government construction projects. That protection is restricted to parties who are no more distant from the prime contractor than sub-subcontractors. J.W. Bateson Co., 434 U.S. at 591.[2] "Subcontractor" status may extend to those who supply necessary material, as well as to those who incorporate items into the structure.
>
> Neither the Miller Act nor the Supreme Court make a distinction between those who supply complex or simple material, nor do they differentiate between projects involving simple and complicated structures. The Court's definition of a "subcontractor" is "one who performs for and takes from the prime contractor a specific part of the labor or materials required by the original contract." MacEvoy, 322 U.S. at 109. A "subcontractor" must have a substantial and important relationship with the prime contractor. F.D. Rich, 417 U.S. at 123. The prime contractor's ability to require the posting of a bond is also an indication of where the risk of financial loss should fall. Id. at 123–24.

E & H Steel, 509 F.3d at 188–89.

This is not to say facts are secondary; they most certainly are not. A consideration of factors including, but not limited to, (1) the terms of any writings, (2) the nature of the materials supplied or labor rendered, (3) the exchange of verbal or written information, and (4) the overall relationship between the prime contractor and alleged subcontractor, is necessary to properly apply the standards of the governing case law. See id. at 188. But a court's task in adjudicating a claim under § 3133(b)(2) is not to pigeonhole each purported

---

[2] In J.W. Bateson Co. v. United States ex rel. Board of Trustees, 434 U.S. 586 (1978), the Court held that union employees of a "sub-subcontractor" could not recover on the payment bond because they did not have a contractual relationship with the prime contractor or a subcontractor.

fact as either consistent or inconsistent with a middleman's "subcontractor" status. The totality of the facts and circumstances is what matters.

II.

The preceding recitation of the Miller Act law does what the parties have failed to do in their respective motions for summary judgment; it necessarily distinguishes between a claim arising under § 3133(b)(1) – where the claimant has an alleged contractual relationship with the prime contractor – and a claim arising under § 3133(b)(2) – where the claimant has a direct contractual relationship with an alleged "subcontractor" of the prime contractor. The parties' motions make no discernible distinction between subsections (b)(1) and (b)(2). As a result, the parties conflate the facts and law relating to each subsection, thereby creating a legal landmine – a landmine they now ask this Court, at its own risk, to traverse in assessing the facts and law, and summarily adjudicating Fairway's Miller Act claim. The Court declines the invitation.

A.

Because Fairway has presented facts that appear to support at least a colorable claim under either § 3133(b)(1) or (b)(2), the Court does not understand why Fairway has not pled them in the alternative. See Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). In its October 2010 order denying White and Arch's motion to dismiss Fairway's original complaint pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction (doc. 16), the Court alerted Fairway to the problem which, a year later, confronts us still:

> A preliminary question is whether Fairway's complaint arises under subsection (b)(1) or (b)(2) of § 3133.  Fairway's complaint seeks recovery based on Mountain Door's breach of the "Fairway Contract."  The complaint alleges: "Mountain Door accepted the terms of the Fairway Contract when it ordered the doors from Fairway for the Courthouse Project."  According to the complaint, Mountain Door was a "subcontractor" of White, the prime contractor.  The complaint further alleges Fairway provided notice of its claim to White.  *All these allegations are consistent with an action under subsection (b)(2).  On its face, the complaint does not allege a contractual relationship between Fairway and White – a requirement for an action under subsection (b)(1) –* although the complaint indicates Fairway performed work and supplied materials pursuant to both Mountain Door's and White's direction. [emphasis added].
>
> White and Arch construe the complaint as arising under subsection (b)(2). . . . Fairway, on the other hand, appears to argue in its response to White's and Arch's motion to dismiss (somewhat dubiously based on the allegations of its complaint) that its claim arises under subsection (b)(1) rather than subsection (b)(2) of § 3133. . . .  The Court, however, *at this time* need not resolve the apparent conflict between the parties' reading of the complaint. [emphasis in original].

Order Denying Defts' Mot. to Dismiss at 4–5 (Oct. 27, 2010).

In response, Fairway amended its complaint, but only to allege diversity jurisdiction, 28 U.S.C. § 1332, in addition to federal question jurisdiction under the Miller Act, 28 U.S.C. § 1331.[3]  Otherwise, the allegations of Fairway's amended complaint (doc. 26) are identical to those of its original complaint (doc. 1).  So too then does the amended complaint fail to allege a contractual relationship between Fairway and White – a requirement for an action under § 3133(b)(1).  Instead, the amended complaint, even under a generous reading, seeks relief based solely on the "Fairway contract," that is, the contract between Fairway and

---

[3] Even in the absence of diversity jurisdiction, the Court has jurisdiction over Fairway's pendent state claims pursuant to 28 U.S.C. § 1367(a).

8

Mountain Door. And to recover against White and Arch based on that contract, subsection (b)(2) requires Fairway prove Mountain Door was a "subcontractor" of White. That the amended complaint does not plead alternative causes of action under § 3133(b)(1) and (b)(2) is inexplicable given not only the plain language of this Court's 2010 order, but also, and more importantly, the very nature of Fairway's factual and legal arguments throughout these proceedings, notably in response to White and Arch's motion to dismiss (doc. 7) and now in support of its own motion for summary judgment.

In ¶¶ 3 and 4 of its memorandum in support of its motion (doc. 33), Fairway states that Mountain Door represented to Fairway that Mountain Door had contracted with White to supply "specialized doors" for the new courthouse and that Mountain Door was a "subcontractor" of White. No one disputes that Mountain Door, in turn, contracted directly with Fairway to supply the doors. Paragraphs 5–12 then state facts suggesting the "specialized" nature of the doors Mountain Door was to supply. All these factual allegations are consistent with Fairway's claim under § 3133(b)(2), as alleged in its amended complaint, that it had a contractual relationship with a "subcontractor" of White. Evidence that White contracted with Mountain Door to supply "specialized," doors tends to establish that Mountain Door was a "subcontractor" of White rather than a materialman. See Lembke Constr., 370 F.2d at 295 (recognizing in a case arising under the former version of subsection (b)(2) that a supplier of "customized" material may be a subcontractor "even though [it] does not perform many services in reference to the installation"). But such evidence is at best marginally relevant to a claim under subsection (b)(1) because such evidence does not

9

directly bear upon whether Fairway, again regardless of its status as a subcontractor, had a contractual relationship, express or implied, with White.

Fairway then shifts gears in ¶¶ 14–26 of its statement of facts and focuses on the relationship that transpired between itself and White after White began experiencing "various problems" with Mountain Door.  Fairway's version of events suggests that Fairway essentially stepped into the shoes of Mountain Door when White began bypassing Mountain Door and dealing directly with Fairway.  Notably, Fairway states in ¶ 25, that White represented to Fairway "that if Fairway would perform the work required to complete the courthouse project so White could obtain the certificate of occupancy for [the] courthouse, then White would make sure that Fairway got paid."  These factual allegations, which bear upon the question of whether a contractual relationship existed between White and Fairway, are consistent with a claim under § 3133(b)(1).  But Fairway has not alleged any such claim in its amended complaint.

The argument portion of Fairway's memorandum confuses matters further.  Fairway's legal discussion focuses entirely on the definition of "subcontractor."  Conspicuously absent is any discussion relating to the law of contractual relationships, express or implied.  This would lead one reasonably to believe Fairway was making a claim under subsection (b)(2), because to prevail under subsection (b)(1) Fairway need not go so far as to prove it was a subcontractor of White.  Rather, under subsection (b)(1) Fairway need only prove it had a contractual relationship, express or implied with White.  But then, oddly enough, Fairway concludes on page ten:  "Fairway 'furnished labor' directly for White on the site of the

project as contemplated by 40 U.S.C. § 3131[sic](b)(1).  Fairway established a "direct contractual relationship, express or implied, with the contractor (White) pursuant to 40 U.S.C. § 3131(b)(2)[sic] by working directly with White to complete the custom ordering, fitting and installation of the doors."  Whether a " contractual relationship, express or implied," existed between Fairway and White, however, is of little concern to subsection (b)(2).  That is a relationship with which subsection (b)(1) is concerned.  Subsection (b)(2) is concerned only with whether Mountain Door was a "subcontractor" of White.

B.

This mess might have been alleviated had White and Arch, unlike Fairway, taken its cue from the Court's October 2010 order.  That order all but conclusively determined Fairway's original complaint did not allege a claim under § 3133(b)(1), notwithstanding Fairway's legal argument suggesting the contrary.  White and Arch could have moved to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) to the extent it also fails to state a claim under § 3133(b)(1).  A proper motion necessarily would have drawn out the the distinction between subsections (b)(1) and (b)(2), and perhaps placed the parties on the correct course.  But instead, White and Arch have filed their own motion of summary judgment which, like Fairway's motion, tends to blur the distinction between the two.

Paragraphs 5–23 of their opening memorandum's statement of facts (doc. 35) bears upon the relationship between White and Mountain Door, and suggests that Mountain Door's responsibility under a "purchase order" with White was to purchase standardized doors for White and deliver them to the courthouse work site.  These allegations bear upon the

question with which subsection (b)(2) is concerned: Whether Mountain Door was a "subcontractor" of White. If not, Fairway cannot recover on the payment bond through its contractual relationship with Mountain Door, the middleman. See Lembke Constr., 370 F.3d at 295–97 (holding claimant could not recover under a former version of subsection (b)(2) because the concrete supplier with whom claimant had contracted was a "materialman" rather than a "subcontractor" of the prime contractor).

Paragraphs 24–33, meanwhile, portray the relationship between White and Fairway as minimal. According to ¶ 30: "All of the work performed on site by Fairway was to repair doors and complete the hardware sets that were shipped incorrectly or damaged in shipment. [White] observed that the repairs were in lieu of replacement of the product that was shipped." Such allegations pertain to the question with which subsection (b)(1) is concerned: Whether White entered into a contractual relationship, express or implied, with Fairway. If not, Fairway cannot recover on the payment bond directly through White.[4]

Meanwhile, the legal discussion in White and Arch's memorandum principally focuses on the question, pertinent to subsection (b)(2), of whether Mountain Door was a "subcontractor" of White. The memorandum states at page ten: "Fairway has brought suit against White's payment bond for materials supplied . . . . [ I]t must be first determined that

---

[4] Both Fairway, and White and Arch, present additional facts in their respective replies in support of their motions for summary judgment. Because adding new facts in a reply brief is an unacceptable practice, the Court has simply ignored those factual allegations. See, e.g., Multi-Ad Serv., Inc. v. NLRB, 255 F.3d 363, 370 (7th Cir. 2001) ("It is well-settled that parties may not raise new arguments or present new facts for the first time in reply.").

Mountain [Door] was a subcontractor to White in order for Fairway to collect against White's payment bond." Never once does that discussion seek to refute Fairway's factual assertion, pertinent to subsection (b)(1), that White bypassed Mountain Door and dealt directly with Fairway, and *promised* to pay Fairway in exchange for the latter's participation in the project. If credible, this is troubling evidence for White and Arch because such evidence may warrant the legal conclusion that some sort of contractual relationship existed between White and Fairway. Rather, with little reference to the interaction between White and Fairway, the discussion summarily concludes at page twelve: "When the Court determines that Mountain did not have a subcontract agreement with White, then Fairway's claims are barred and fail because no contract existed between White and Fairway."

### III.

Enough said. Given the conflicting state of the evidentiary record and the parties' convoluted legal arguments thereon, summary judgment for either side is unwarranted in this case. Accordingly, the parties' cross-motions for summary judgment (doc. 32 & 34) are DENIED. Counsel for all parties are once again instructed, as they were in the Court's pretrial order of February 3, 2011 (doc. 23), that the proposed Consolidated Final Pretrial Order due to the Court on October 11, 2011, shall set forth numerically, and with specificity, each claim/defense asserted and the elements necessary to prove each claim/defense. The claims/defenses so set forth shall supercede the pleadings for purposes of trial, including for purposes of adjudicating motions made pursuant to Fed. R. Civ. P. 50. To expedite this matter, Fairway is hereby GRANTED leave to submit claims against White and Arch arising

under both 40 U.S.C. § 3133(b)(1) and (b)(2), as well as under theories of unjust enrichment and quantum meruit.  That same day, October 11, 2011, counsel for each side shall submit to the Court a set of four proposed Findings of Fact and Conclusions of Law relating to each of Fairway's four separate claims.  The Court is satisfied that only the imposition of this burdensome measure will assure that the parties properly distinguish between each of Fairway's legal claims.

    SO ORDERED.

    Entered for the Court
    this 26th day of September, 2011


    Bobby R. Baldock
    United States Circuit Judge
    Sitting by Designation